```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/18/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANET PRUTER, *et al.*,

       Plaintiffs,

-against-

LOCAL 210, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

       Defendant.

15 Civ. 1153 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiffs, former employees of World Airways, Inc. ("World"), bring this action against Defendant, Local 210, International Brotherhood of Teamsters ("Local 210"), claiming that Defendant violated its duty of fair representation under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, by failing to fulfill its promise to fund a part of Plaintiffs' pensions.[1]  Now before the Court is Defendant's motion for summary judgment on that claim.  ECF No. 71.  For the reasons stated below, Defendant's motion for is DENIED.

## BACKGROUND[2]

Plaintiffs are former employees of World, a now-defunct airline that filed for federal bankruptcy protection in 2012.  Am. Compl. ¶¶ 8–95, 110, ECF No. 4; 56.1 Counterstmt. ¶¶ 2, 49, ECF No. 81.[3]  In 1996, Plaintiffs transferred their membership to Local 210, 56.1

---

[1] Plaintiffs originally brought claims under the Employment Retirement Income Security Act of 1974 ("ERISA") and state law, but this Court held that they had failed to state an ERISA claim, and that their state law claims were preempted by the RLA.  *Pruter v. Local 210's Pension Tr. Fund* (*Pruter I*), No. 15 Civ. 1153, 2016 WL 908303, at *2–3 (S.D.N.Y. Feb. 8, 2016), *aff'd in relevant part*, 858 F.3d 753 (2d Cir. 2017).  In light of that holding, the Court permitted Plaintiffs to proceed with a claim under the RLA.  *See Pruter v. Local 210's Pension Tr. Fund* (*Pruter II*), No. 15 Civ. 1153, 2017 WL 6513648, at *5 (S.D.N.Y. Dec. 8, 2017).

[2] The following facts are drawn from the parties' pleadings and submissions, including the complaint, and the Rule 56.1 statement of undisputed fact and the response thereto.  Facts in dispute are so noted.  Citations to a paragraph in Plaintiffs' Rule 56.1 Counterstatement also include Defendant's original statement of undisputed fact.

[3] Plaintiffs responded to a number of Defendant's proposed statements of undisputed fact by asserting only that they were "not material to the motion."  *See* 56.1 Counterstmt. ¶¶ 1–5, 10, 28–29, 45–48.  Also, in a number of instances Plaintiffs' response asserted the existence of an issue of material fact, but did not specifically respond to the

Counterstmt. ¶¶ 3–4, and Local 210 began negotiating a new collective bargaining agreement with World. *Id.* ¶ 7. Local 210's negotiating team included its business agent, Kevin Nolan, as well as World flight attendants Christine Tittiger, Jenny Saxton, Maureen Jepson, Ellen Hill, and Lisa Comalli, and International Brotherhood of Teamsters ("IBT") representative Victoria Gray. *Id.* ¶ 8. (Tittiger, Saxton, Jepson, and Comalli are Plaintiffs in this case. Am. Compl. ¶¶ 17, 41, 72, 84.) Among other issues, flight attendants were dissatisfied with the World pension plan, and wanted to switch over to a "defined benefit" plan. 56.1 Counterstmt. ¶ 9. In April and May 1996, bargaining committee members reviewed several defined benefit pension plans, including the Local 210 Pension Plan (the "Plan"), with the object of proposing that World become a contributor to one of them. *Id.* ¶ 16. The bargaining committee ultimately proposed that World become a contributor to the Local 210 Pension Plan. *Id.* ¶ 22.

In a letter dated June 17, 1996, to Local 210 members (the "June 17 Flyer"), Gray described the bargaining committee's position on a number of issues, including retirement. June 17 Flyer at 2, ECF No. 82-1; 56.1 Counterstmt. ¶ 24. On the issue of retirement plans, the Flyer stated:

> The target benefit plan provided by [World] is woefully inadequate and must be replaced. It operates on the assumption that the money contributed by [World] will earn 8% interest and it has consistently failed to do so. [World] refused to take on the financial burden that would provide each of us a decent retirement.
>
> We are very pleased to advise that Local 210 offers retirement plans for its members where the employer does not have sufficient funds or is unwilling to commit the necessary cash to provide a viable retirement. Local 210 has designed a federally insured, 100% funded, **"defined benefit plan"** to which [World] will provide monthly contributions with a 100% past service credit after a 5 year vesting period. This will provide a[n] extraordinary improvement in

---

allegation made by Defendant. *See, e.g., id.* ¶¶ 11–14, 17–23, 25, 28–32, 37–38. Local Rule 56.1(c) provides that "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Accordingly, the Court will treat as admitted for purposes of this motion those statements that Plaintiff did not specifically contest.

> our benefit from today's level.
>
> This is possible because, while [World] will never contribute enough money to have purchased the benefit for us, our Union (and the members of our local who will vote to accept us into their plan) are willing to accept the liability to protect and make a long term commitment to represent us. They do this with the thought that, like an insurance approach, if some people resign before retirement and therefore do not use the retirement benefit it will be able to pay for the benefit of those who will stay until retirement age.
>
> Furthermore, if the airline expands the pool of [flight attendants,] members will increase and help the funding levels. There is a risk for our fellow members of Local 210 but they are willing to assume that risk for us.

June 17 Flyer at 2.

On June 27, 1996, Local 210 and World reached a tentative collective bargaining agreement, which provided for a 10% wage increase on ratification and a 3% wage increase each year thereafter, and provided that World would begin making contributions to the Local 210 Pension Plan on behalf of the flight attendants. 56.1 Counterstmt. ¶¶ 27–30.

On July 9, 1996, after the collective bargaining agreement was finalized but before union members voted on it, Kevin Nolan sent another letter (the "July 9 Letter") to the union members encouraging them to ratify the agreement. July 9 Letter, ECF No. 82-2. It listed a number of areas in which the negotiating team had obtained improvements in the new contract, and then stated:

> I would like to explain to you the depth of commitment this Local union has for its new members. With the approval of Secretary-Treasurer Angelo Martin, this Local created a new Pension Plan for the employees at World Airways. This plan[,] which I negotiated into your contract, gives Pension credit to all members back to their date of hire, after vesting. In other words if you have worked at the company for ten (10) years to date, and you work another five (5) years, at retirement you will receive <u>$600.00 per month for life</u>.
>
> This Pension Plan has a cost to the Union of over $700,000.00 which we are willing to pay to secure a better tomorrow for our new members.
>
> Our purpose is to provide and protect our membership. The members and officers of Local 210 are happy to have you in this Union, and will use the resources of this

3

Union to ensure your rights are protected.

*Id.* at 1–2.

The flight attendants thereafter voted to ratify the collective bargaining agreement. 56.1 Counterstmt. ¶ 35. Following the contract ratification, the Trustees of the Local 210 Pension Plan voted to admit World as a contributing employer and to provide past service credits to the World flight attendants after a five-year vesting period. *Id.* ¶ 45.

In 1996, the Local 210 Pension Plan Trust Agreement did not allow past service credits to be cancelled once awarded. *Id.* ¶ 46. But in 2008, the agreement was amended to allow the Trustees to cancel past service credits to preserve the actuarial soundness of the fund. *Id.* ¶ 47. In 2012, World filed for bankruptcy and ceased operations; the Plan assessed World $18,000,000 in withdrawal liability. *Id.* ¶ 49; Am. Compl. ¶ 110. That liability was discharged in the bankruptcy. 56.1 Counterstmt. ¶ 49. As a consequence, the Plan faced a shortfall, and in December 2012 the Trustees voted to cancel the past service credits provided to World flight attendants. *Id.* ¶ 50. Upon inquiry from Plaintiffs' counsel, the Plan's attorney stated in a letter dated June 14, 2013 that the Plan had never received contributions from World for the past service credits, and that the Trustees had authority to cancel the credits under Section 14.5(b) of the Plan's governing document. June 14, 2013 Letter, ECF No. 4-8.

The cancellation of credits reduced the monthly pension benefits available to Plaintiffs. Am. Compl. ¶ 114. After pursuing administrative relief through the Plan, *id.* ¶ 116, Plaintiffs filed this action on February 18, 2015, ECF No. 1. Plaintiffs alleged that Local 210 in fact (a) never obtained an agreement from World to fully fund the past service credits, or obtained such an agreement but failed to enforce the obligation incurred by World, and (b) never contributed the $700,000 of its own assets it had promised to contribute to the Plan. *Id.* ¶ 117. They brought

fraud and breach of contract claims against Local 210. *Id.* ¶¶ 120–24.

On February 8, 2016, this Court dismissed the complaint on the grounds that Plaintiffs' claims against Local 210 were preempted by the RLA, and that any RLA claim was barred by a six-month statute of limitations. *Pruter I*, 2016 WL 908303, at *3; *see* ECF No. 27 at 7. On appeal, the Second Circuit held that the Court should have borrowed the three-year statute of limitations from the Employee Retirement Income Securities Act ("ERISA") for the RLA claim. *See* 858 F.3d at 761; ECF No. 30 at 20. Accordingly, the appeals court found that Plaintiffs could assert a timely RLA claim, and remanded for further consideration. On remand, this Court held that Plaintiffs' complaint stated a claim under the RLA for breach of the duty of fair representation, because the complaint's allegations made it "plausible that union members voted to approve the agreement because of the union's assurances to fund their pensions." *Pruter II*, 2017 WL 6513648, at *6; ECF No. 39 at 12.

On March 7, 2019, Defendant moved for summary judgment. ECF No. 71. Defendant asserted that (1) Plaintiffs failed to produce evidence that Defendant had represented that it would fund or guarantee past service credits, Def. Mem. at 16, ECF No. 76; and (2) Plaintiffs had failed to produce evidence showing that the alleged misrepresentations had caused their injuries, *id.* at 20.

## DISCUSSION

I. Legal Standards

    A. Summary Judgment

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Feingold v. New York,* 366

F.3d 138, 148 (2d Cir. 2004). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Material facts are those which, under governing law, may affect the outcome of a case. *Id.*

The moving party initially bears the burden of informing the court of the absence of a genuine dispute of material fact by citing to particular evidence in the record. Fed. R. Civ. P. 56(a), (c); *Celotex,* 477 U.S. at 322–25; *Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir. 2002). The movant may satisfy its burden by "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(B). If the non-moving party has the burden of proof on specific issues, the movant may also satisfy its initial burden by demonstrating that the adverse party cannot produce admissible evidence to support an issue of fact. *Celotex,* 477 U.S. at 322–23; *PepsiCo Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002). In deciding the motion, the court views the record in the light most favorable to the nonmoving party. *O'Hara v. Weeks Marine, Inc.,* 294 F.3d 55, 61 (2d Cir. 2002).

If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine dispute of fact. *Beard v. Banks,* 548 U.S. 521, 529 (2006); *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir. 2001). The opposing party may not avoid summary judgment by relying solely on conclusory allegations or denials that are unsupported by facts. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.,* 302 F.3d 83, 91 (2d Cir. 2002). Instead, the opposing party must set forth "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324 (internal quotation marks omitted).

    B.    <u>Duty of Fair Representation</u>

"Under the RLA, compensatory damages are available for breach of the union's duty of

fair representation." *Samuels v. Air Transp. Local 504*, No. 86 Civ. 8222, 1993 WL 524946, at *2 (S.D.N.Y. Dec. 10, 1993), *aff'd*, 41 F.3d 1501 (2d Cir. 1994). "A claim for breach of the duty of fair representation consists of two elements." *White v. White Rose Food,* 237 F.3d 174, 179 (2d Cir. 2001). The first element is substantive and requires that a plaintiff demonstrate that the union's "conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* (quoting *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998)). The second element pertains to causation and requires that a plaintiff demonstrate "a causal connection between the union's wrongful conduct and [the plaintiff's] injuries." *Id.* (quoting *Spellacy v. Airline Pilots Ass'n–Int'l,* 156 F.3d 120, 126 (2d Cir. 1998)).

A union's actions are arbitrary "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." *Spellacy*, 156 F.3d at 129 (alteration in original) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67 (1991)). A union acts in bad faith when it acts fraudulently, deceitfully, or dishonestly, *White,* 237 F.3d at 179, and with "an improper intent, purpose, or motive," *Vaughn v. Air Line Pilots Ass'n Int'l.,* 604 F.3d 703, 710 (2d Cir. 2010) (quoting *Spellacy,* 156 F.3d at 126).

II. Analysis

    A. Bad Faith

Plaintiffs allege that Defendant acted deceitfully or dishonestly in leading them to believe that Defendant itself—and not the Plan, a separate entity—would put forward the money to guarantee their past service credit. Pl. Opp. at 2, ECF No. 83. But Defendant claims that Plaintiffs have not produced evidence of any communication from Defendant or its agents that would have led them to believe that Local 210 would assume responsibility for funding pre-1996

7

service credits. Def. Mem. at 16–19. Plaintiffs point to two written communications in which they assert Defendant encouraged this false belief: the June 17 Flyer, and the July 9 Letter. Pl. Opp. at 9–11. They also claim that business manager Kevin Nolan and secretary-treasurer Angelo Martin did so in personal conversations. Pl. Opp. at 12–13. Taken together and viewed in the light most favorable to Plaintiffs, the evidence put forward by Plaintiffs could be sufficient for a jury to conclude that Defendant represented that it would ensure there was sufficient funding to cover past service credits.

1. Written Communications

The June 17 Flyer states that "Local 210 offers retirement plans for its members where the employer does not have sufficient funds or is unwilling to commit the necessary cash to provide a viable retirement." June 17 Flyer at 2. In explaining how those plans worked, it says, "while [World] will never contribute enough money to have purchased the benefit for us, our Union (and the members of our local who will vote to accept us into their plan) are willing to accept the liability to protect and make a long term commitment to represent us." *Id.* And it reiterates that "[t]here is a risk for our fellow members of Local 210 but they are willing to assume that risk for us." *Id.* All of those statements suggest that the union and its members, not another entity, would undertake to provide sufficient funds to guarantee past service credits. Defendant is wrong in arguing that this language unequivocally indicates that the Plan, and not Defendant, was responsible for ensuring that past service credits would be available. Def. Mem. at 17–18. It is true that the June 17 Flyer mentions the Plan, and that this could have put a careful reader on notice that it was the mechanics of a separate pension plan that would provide funding for past service credits. *See* June 17 Flyer at 2. But the Flyer also repeatedly refers to the union and its members as the actors who will "protect" the World employees by

8

"accept[ing] . . . liability" and "assum[ing] . . . risk," *id.*, and those statements could be understood to mean that Defendant itself would be taking action to fund Plaintiffs' pensions.

In addition, Defendant argues that the June 17 Flyer was by its terms a statement of bargaining positions, and that only the final contract was binding. Def. Mem. at 18. But the Flyer's description of how the Local 210 defined benefit plan worked, and what role Defendant would play, was not contingent on the details of the ultimate collective bargaining agreement. Defendant also argues that Plaintiffs have failed to produce evidence that most of the Plaintiffs, let alone most of the World flight attendants as a whole, read the June 27 Flyer. Def. Mem. at 18. Even if true, however, that assertion is not relevant to the question of whether Defendant made the false representation that it would take responsibility for funding the past service credits.

The July 9 Letter bolsters Plaintiffs' case. In the Letter, Kevin Nolan, Defendant's chief negotiator, introduces the retirement plan by stating that "I would like to explain to you the depth of commitment this Local union has for its new members," July 9 Letter at 1, suggesting that Defendant is taking on an obligation. The next sentence then states that the "Local created a new Pension Plan for the employees at World Airways." *Id.* But the remainder of the letter strongly suggests that Defendant itself will be responsible for securing the benefits provided by that plan. Most suggestively, it represents that "[t]his Pension Plan has a cost *to the Union* of over $700,000.00 which we are willing to pay to secure a better tomorrow for our new members." *Id.* (emphasis added). On its face, that statement indicates that Defendant would be making a contribution to the plan to ensure retirement for the flight attendants. And the letter concludes by promising that "[t]he members and officers of Local 210 . . . will use the resources of this Union to ensure your rights are protected." *Id.* at 1–2.

Defendant's only argument as to whether the July 9 Letter creates a fact issue on the

question of bad faith is that it was sent to flight attendants "some 13 days *after* the ratification ballot." Def. Mem. at 17; *see* Reply at 6–7, ECF No. 84. Defendant argues that because Plaintiffs have no evidence that the July 9 Letter affected any member's vote on ratifying the contract, it should be disregarded as irrelevant. Def Mem. at 17. Plaintiffs point out, however, that balloting on ratification lasted until July 31, 1996, so there was plenty of time for the flight attendants to review the letter prior to voting. Pl. Opp. at 13–14. Indeed, it would have made little sense for Defendant to send out a letter urging its members to vote in favor of ratifying a collective bargaining agreement at a point in time where it was too late to affect any votes. Unsurprisingly, Victoria Gray, the IBT representative, testified that union members "tend to respond as soon as they get the ballot," but that "[t]he difference with this group is just that they fly, and they may not be home . . . [s]o it might take them a little longer." Gray Depo. at 62:17–24, ECF No. 74-4; *see also id.* at 64:9–16 (acknowledging that response could take longer because "these people were flying, so they may not have been home" when ballots were first mailed). Thus, the Court cannot disregard the July 9 Letter as irrelevant.

Finally, Defendant points out that the tentative collective bargaining agreement and the highlight sheet summarizing its terms did not even mention past service credit, and argues that this omission should have disabused Plaintiffs of the idea that Defendant would ensure funding for the credit. Def. Mem. at 18. But that inference does not follow. A reasonable jury could interpret the tentative agreement's silence on this issue as showing that Defendant was handling the funding for the past service credits outside of the collective bargaining process.

      2. <u>Verbal Communications</u>

Plaintiffs also point to deposition testimony from three World flight attendants—Christine Tittiger, Jenny Saxton, and Maureen Jepson-Zar—that officers of Defendant told them

10

in personal conversations that Defendant would ensure adequate funding of past service credit. Pl. Opp. at 13. Those three Plaintiffs' depositions "have been designated by stipulation to bind and constitute the testimony of all of the 87 plaintiffs." Def. Mem. at 2; Pl. Opp. at 2 ("[T]he parties agreed that those deposed were representative [P]laintiffs."); *see* ECF No. 59 at 1 ("In order to streamline discovery, counsel for the parties have agreed and stipulated that [P]laintiffs' counsel will select three individual [P]laintiffs who testimony would bind the entire group concerning Local 210's potential liability on the claims set forth in the amended complaint."). The testimony of Tittiger, Saxton, and Jepson-Yar, however, provides little additional support to Plaintiffs' theory of liability.

Tittiger was an in-flight service manager at World, Tittiger Dep. at 9:15–25, ECF No. 74-1, and was involved in the 1996 negotiations as a member of the union council, *id.* at 22:11–20. In her deposition, she testified that Nolan, the Local 210 business manager, told her that "the past service credit would be taken care of." *Id.* at 112:12–18; *see also id.* at 114::3–9. But when asked if Nolan had told her that Defendant would fund the past service credit, she responded, "I don't think he ever put it into those words." *Id.* at 112:19–23. She also testified that Angelo Martin, the secretary-treasurer of Local 210, told her in personal conversations the same basic content as was in the July 9 Letter. *Id.* at 129:21–25, 131:14–133:10. She clarified, however, that "[i]t was a general conversation" she had with Martin, *id.* at 135:1, and that she could recall him saying only "[t]hat he cared a lot about the members. He . . . wanted to make sure that we got what we deserved and that . . . everything Kevin [Nolan] promised is going to happen." *Id.* at 134:11–18; *see also id.* at 136:7–15 ("You know, Angelo was a real paternalistic guy, and I remember him putting his arm around me and saying, you know, we're going to take care of this, and — you know, just a general feeling of, I care about you and the group. . . . I can't remember

11

specific words . . . [b]ut the feeling was, you know, you're in my family and I'm taking care of you as a group.").

Saxton also worked for World, Saxton Dep. at 20:1–8, 74-3, and participated in the 1996 negotiations as a member of the union council, *id.* at 20:12–24. Saxton testified in her deposition that Nolan represented that Defendant had a pension plan that would provide past service credit. *Id.* at 38:24–39:12, 40:14–41:3. But she testified that Nolan mentioned this at an early stage in the negotiations, and she did not recall Nolan representing that Defendant would pay for the past service credit out of its own funds, or otherwise guarantee it. *Id.* at 39:13–40:14; *see also id.* at 48:15–50:24.

Jepson-Zar, too, was a flight attendant with World, Jepson-Zar Dep. at 11:3–20, ECF No. 74-2, and served on the union council during the 1996 negotiations, *id.* at 12:3–14:4. Jepson-Zar also testified that Nolan told her that past service credits would be paid for if World became a contributing employer to the Plan. *Id.* at 70:17–72:24. But she too could not recall specifically how that funding would be taken care of. *Id.* at 74:20–75:12.

All told, the representative Plaintiffs' testimony indicates very little about whether Defendant made dishonest statements. It does suggest that Plaintiffs were reassured by agents of Defendant that past service credits would be funded in some way; combined with the written communications' specific representations about pension funding, that testimony perhaps provides some very slight support for Plaintiffs' theory. But unlike the written communications discussed above, the testimony says virtually nothing about the dispositive questions of how the funding would take place, and whose responsibility it would be. Nevertheless, defeating a motion for summary judgment does not require that every piece of evidence adduced by the non-moving party advances its case, so long as the evidence as a whole is enough for a reasonable

12

jury to find in their favor. *See, e.g. Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014) (reversing a grant of summary judgment where "there was (barely) enough evidence . . . from which a reasonable jury could find" in plaintiff's favor).

### 3. Conclusion

Most of the communications produced by Plaintiffs can be interpreted, as Defendant suggests, as somewhat simplified explanations of how a union pension plan works, and not as commitments by Defendant itself. But the communications can also be read as a promise by Defendant to directly fund Plaintiffs' past service credits. If Plaintiffs' interpretation is the correct one, Defendant's statements were at least potentially dishonest.[4] And because the Court must view the evidence in the light most favorable to Plaintiffs, their interpretation must win out for purposes of summary judgment.

Accordingly, Defendant's motion for summary judgment on the issue of bad faith is DENIED.

### B. Causation

Defendant asserts that Plaintiffs have not produced evidence showing that communications from Defendant regarding past service credit caused their injuries. Def. Mem. at 20–22. To make out a duty of fair representation claim, "plaintiffs, in addition to establishing that a union acted unreasonably and in bad faith, must allege a causal connection between the union's wrongful conduct and the alleged injuries." *Sim v. New York Mailers' Union No. 6*, 166 F.3d 465, 472 (2d Cir. 1999); *see also Spellacy*, 156 F.3d at 126 ("Establishing that the union's actions were sufficiently arbitrary, discriminatory or in bad faith, is only the first step toward

---

[4] Defendant has not argued that Plaintiffs have failed to create a fact issue on the question of whether Defendant acted with "an improper intent, purpose, or motive," *Vaughn,* 604 F.3d at 710, so the Court does not consider that issue. *See generally* Def. Mem. at 16–19. But, of course, at trial Plaintiffs must show that Defendant's statements were fraudulent, deceitful, or dishonest *and* that Defendant made those statements with a wrongful state of mind.

13

proving a fair representation claim. Plaintiffs must then demonstrate a causal connection between the union's wrongful conduct and their injuries." (internal quotation marks and citation omitted)).

The first issue the Court must determine is the exact legal injury for which Plaintiffs are seeking compensation. Defendant contends that if Plaintiffs have suffered any cognizable injury, it is the diminished wage increase that they allegedly accepted in return for funding of past service credit. Def. Mem. at 20–21. Plaintiffs, however, claim that their injury was "the loss of their full pension benefit," and "[n]ot, as Defendant argues, loss of a better wage increase." Pl. Opp. at 2; *see also id.* at 19 ("Plaintiffs have not sued about not getting a better wage increase."). In a prior opinion, the Court already addressed this issue, and held that Plaintiffs can recover for the loss of their pension benefits. *See Pruter II*, 2017 WL 6513648, at *5 ("[I]f Local 210 breached the duty of fair representation by failing to fulfill its promise to fund Plaintiffs' past service credits, paying each Plaintiff the value of their lost past service credits would recompense them for the union's breach."). The question, therefore, is whether Plaintiffs can show that Defendant's misrepresentations caused the loss of their past service credits.

Defendant claims that Plaintiffs have not produced evidence that would allow a verdict on this issue, because they have not shown that Defendant's statements caused ratification of the collective bargaining agreement. Def. Mem. at 20–22. Showing that Defendant's statements caused ratification of the agreement is a necessary component of Plaintiff's claim, because but for the collective bargaining agreement, Plaintiffs would not have been part of the Plan. Thus, in order to show that Defendant caused their injuries, "in addition to proving that [Defendant] acted arbitrarily and in bad faith, [P]laintiffs must demonstrate that any alleged misconduct had an effect on the outcome of the . . . ratification vote." *Sim*, 166 F.3d at 472.

14

Defendant argues that Plaintiffs cannot do so, because "at least 300 flight attendants out of a unit of 357 people voted" to approve the agreement, and "[u]sing simpl[e] math, it[']s easy to conclude that even if all 87 [P]laintiffs were to testify that they voted to approve the contract based on supposed misrepresentations by Local 210, it would not have changed the outcome of the vote." Def. Mem. at 20. Defendant is correct that Plaintiffs must be able to show that a majority of the World flight attendants would not have voted to ratify the agreement but for Defendant's representations concerning pension funding. In *Sim v. New York Mailer's Union 6*, the Second Circuit held that plaintiffs had failed to establish causation where "the most plaintiffs ha[d] shown is that two members may have changed their votes in response to" improper communications, and "the [a]greement ultimately passed by twenty-four votes." 166 F.3d at 472–73. Other courts in this circuit have reached the same holding. *See, e.g.*, *Alonci v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO,* No. 05 Civ. 6608 CJS, 2009 WL 4730318, at *13 (W.D.N.Y. Dec. 4, 2009) (holding in a case where the ratification vote was 454 for yes and 59 for no that plaintiffs had failed to establish causation because "no evidentiary proof in admissible form has been presented to the Court to show that any members who voted yes, would, instead, have voted no.").

Unlike in the cases relied on by Defendant, however, Plaintiffs here have produced substantial evidence that pension funding, and specifically funding for past service credits, was a critical voting issue for a large bloc of World flight attendants. Each of the representative Plaintiffs testified that the funding of past service credit was the key factor in her vote. *See* Tittiger Dep. at 130:14–18; Saxton Dep. at 52:19–53:5; Jepson-Zar Dep. at 114:18–25. Moreover, funding of past service credit was clearly a major component of Defendant's campaign in favor of the agreement. It was prominently highlighted in Defendant's

15

communications to its membership; significant portions of both the June 17 Flyer and the July 9 Letter touted full funding of past service credit as an important benefit of the agreement. June 27 Flyer at 2; July 9 Letter at 1. Though the representative Plaintiffs could not recall the details of the funding mechanism, they each testified in their depositions that senior Local 210 leadership communicated with them personally about past service credits being taken care of. *See* Tittiger Dep. at 112:12–18, 114:3–9; Saxton Dep. at 38:24–39:12, 40:14–41:3; Jepson-Zar Dep. at 70:17–72:24. If this issue was important enough to be highlighted by Defendant's senior leaders in both written and personal communications in support of the agreement, then a jury could reasonably infer that it was important enough to affect a majority of members' votes. *Cf. Zagari v. Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers*, No. 05 Civ. 6608, 2007 WL 4373542, at *9 (W.D.N.Y. Dec. 10, 2007) (rejecting the argument that plaintiffs "could not prove that the 2005 amendments would not have been ratified had the alleged misrepresentations not been made since the amendments passed by hundreds of votes and plaintiffs number approximately 87."). Indeed, even relying on "simpl[e] math," Def. Mem. at 20, Plaintiffs' 87 votes added to the 57 existing "no" votes would have been nearly enough to change the outcome of the election; a jury would only need to infer that 35 additional flight attendants would have been swayed in order to find causation. The evidence produced by Plaintiffs could allow a jury to draw that conclusion.

Defendant moves for summary judgment on the issue of causation based only on the assertion that Plaintiffs have not produced evidence showing that Defendant's representations led them to ratify the collective bargaining agreement, and so the Court's summary judgment analysis is limited to that issue. The Court notes, however, that Plaintiff's burden of causation does not stop with showing that Defendant's bad faith statements led to ratification. To show "a

causal connection between the union's wrongful conduct and their injuries," *Spellacy*, 156 F.3d at 126, Plaintiffs must also show that Defendant's failure to live up to its commitment to fund the past service credit caused the eventual reduction in their pension benefits. Proof on that issue, however, will have to wait for trial.

Because Plaintiffs have produced sufficient evidence to carry their burden on the question of whether Defendant's representations led to ratification of the collective bargaining agreement, Defendant's motion for summary judgment on the issue of causation is DENIED.

## CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate the motion at ECF No. 71.

Trial will commence on **August 31, 2020**, at **9:00 a.m.**

SO ORDERED.

Dated: February 18, 2020
      New York, New York

_____
ANALISA TORRES
United States District Judge